IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Judge John L. Kane


Civil Action No. 10-cv-00655-JLK-KMT

BRADLEY C. SMITH, derivatively on behalf of OPPENHEIMER GOLD & SPECIAL MINERALS FUND,

      Plaintiff,

v.

OPPENHEIMERFUNDS DISTRIBUTOR, INC.,
MATTHEW P. FINK,
PHILLIP A. GRIFFITHS,
MARY F. MILLER,
JOEL W. MOTLEY,
MARY ANN TYNAN,
JOSEPH H. WIKLER,
PETER I. WOLD,
BRIAN F. WRUBLE,
DAVID K. DOWNES,
RUSSELL S. REYNOLDS, JR.,
WILLIAM F. GLAVIN,
THOMAS W. COURTNEY,
LACY B. HERRMANN, and
JOHN V. MURPHY,

      Defendants,

OPPENHEIMER GOLD & SPECIAL MINERALS FUND,

      Nominal Defendant.

---

**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FOR FAILURE TO STATE A OF OPPENHEIMERFUNDS DISTRIBUTOR, INC., WILLIAM F. GLAVIN, AND JOHN V. MURPHY**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND:  MUTUAL FUNDS, BROKER-DEALERS, AND ASSET-BASED
      COMPENSATION ............................................................................5

      A.     Historical Context .................................................................5

      B.     The Rise and Fall of SEC Rule 202(a)(11)-1, Which Previously
            Permitted Broker-Dealers to Receive Asset-Based Compensation
            in Connection With Brokerage Accounts ...................................9

      C.     Recent Development:  The SEC Proposes  to Rescind Rule 12b-1 ..........13

FACTS ALLEGED IN THIS CASE .................................................................14

LEGAL STANDARD ...................................................................................16

ARGUMENT ............................................................................................17

      I.     INTRODUCTION .................................................................17

      II.    THE PAYMENTS AT ISSUE ARE UNLAWFUL .............................18

           A.     All Broker-Dealers Fall Within the Broad Definition of Investment
              Adviser ...........................................................................18

           B.     The Broker-Dealer Exclusion Is Inapplicable If Asset-Based
              Compensation Is Received.......................................................20

      III.   UNLAWFUL PAYMENTS ARE AN IMPROPER USE OF TRUST
            ASSETS ...........................................................................24

      IV.   DEFENDANTS' DUTIES UNDER THE ICA TRUMP THEIR
            CONTRACTUAL ARRANGEMENTS TO MAKE UNLAWFUL
            PAYMENTS ......................................................................27

           A.     Section 47(b) Permits Actions For Rescission and Restitution ...............27

           B.     The Trust's Right to Restitution Is Adequately Alleged .........................32

      V.    THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION
            OVER THE STATE LAW CLAIMS .................................................34

CONCLUSION..........................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alvarado v. KOB-TV, LLC*,
  493 F.3d 1210 (10th Cir. 2007) .........................................................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................................17

*Berckeley Inv. Group Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006)...............................................................................................28

*Brown v. Bullock*,
  194 F. Supp. 207 (S.D.N.Y. 1961), *aff'd*, 294 F.2d 415 (2d Cir. 1961) (en banc) .................28

*Bryson v. Gonzales*,
  534 F.3d 1282 (10th Cir. 2008) .........................................................................................17

*Burks v. Lasker*,
  441 U.S. 471 (1979)............................................................................................................25

*Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*,
  No. 97-359, 1999 U.S. Dist. LEXIS 15383 (S.D. Cal. Aug. 12, 1999) ....................................30

*Cooper v. Pac. Life Ins. Co.*,
  229 F.R.D. 245 (S.D. Ga. 2005) .........................................................................................28

*Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.*,
  93 F. Supp. 2d 220 (D. Conn. 2000)...................................................................................28

*Davis v. Bailey*,
  2005 U.S. Dist. LEXIS 38204 (D. Colo. Dec. 22, 2005).......................................................30

*Dubbs v. Head Start, Inc.*,
  336 F.3d 1194 (10th Cir. 2003) .........................................................................................16

*Dull v. Arch*,
  2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005)........................................................30

*EnergyTec, Inc. v. Proctor*,
  516 F. Supp. 2d 660 (N.D. Tex. 2007) ...............................................................................33

*Everett v. Bozic*,
  No. 05-296, 2006 U.S. Dist. LEXIS 55824 (S.D.N.Y. Aug. 2, 2006)....................................30

*FDIC v. Appling*,
  992 F.2d 1109 (10th Cir. 1993) .........................................................................................33

*Financial Planning Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) ................................................................. *passim*

*Fogel v. Chestnutt*,
   533 F.2d 731 (2d Cir. 1975)........................................................................24

*Franklin Nat'l Bank v. L.B. Meadows & Co.*,
   318 F. Supp. 1339 (E.D.N.Y. 1970) ............................................................28

*Freeman v. Marine Midland Bank-New York*,
   No. 71-42, 1979 U.S. Dist. LEXIS 12177 (E.D.N.Y. May 24, 1979) ...................28

*GFL Advantage Fund, Ltd. v. Colkitt*,
   272 F.3d 189 (3d Cir. 2001)........................................................................27

*Goldstein v. Groesbeck*,
   142 F.2d 422 (2d Cir. 1944)........................................................................32

*Hamilton v. Allen*,
   396 F. Supp. 2d 545 (E.D. Pa. 2005) ..........................................................30

*Hutto v. Davis*,
   454 U.S. 370 (1982).................................................................................30

*In re Mutual Funds Inv. Litig.*,
   384 F. Supp. 2d 873 (D. Md. 2005) .............................................................32

*In re: Quest Capital Strategies, Inc.*,
   1999 SEC LEXIS 727 (Apr. 12, 1999) .........................................................24

*Kardon v. Nat'l Gypsum Co.*,
   69 F. Supp. 512 (E.D. Pa. 1946) .................................................................28

*Kassover v. UBS AG*,
   619 F. Supp. 2d 28 (S.D.N.Y. 2008)............................................................23

*Luzerne County Ret. Bd. v. Makowski*,
   627 F. Supp. 2d 506 (M.D. Pa. 2007) ..........................................................23

*Margaret Hall Found., Inc. v. Atl. Fin. Mgmt., Inc.*,
   572 F. Supp. 1475 (D. Mass. 1983) .............................................................28

*Mutchka v. Harris*,
   373 F. Supp. 2d 1021 (C.D. Cal. 2005) ........................................................30

*Nicodemus v. Union Pacific Corp.*,
   440 F.3d 1227 (10th Cir. 2006) ..................................................................34

*Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*,
   678 F.2d 552 (5th Cir. 1982) ................................................................31

*Rhoades v. Powell*,
   644 F. Supp. 645 (E.D. Cal. 1986)........................................................28

*Roberts v. Smith Barney, Harris Upham & Co.*,
   653 F. Supp. 406 (D. Mass. 1986) ........................................................28

*SEC v. Kenton Capital, Ltd*,
   69 F. Supp. 2d 1 (D.D.C. 1998) .......................................................23, 24

*Smith v. Franklin/Templeton Distribs.*,
   No. 09-4775, 2010 U.S. Dist. LEXIS 56516 (N.D. Cal. June 8, 2010)..............................4, 29

*Stegall v. Ladner*,
   394 F. Supp. 2d 358 (D. Mass. 2005) ...................................................30

*Thomas v. Metro. Life Ins. Co.*,
   No. 07-121, 2009 U.S. Dist. LEXIS 78014 (W.D. Okla. Aug. 31, 2009) ....................22, 23

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979)....................................................................27, 29, 32

*United States v. First City Nat'l Bank*,
   386 U.S. 361 (1967)....................................................................20

*United States v. Maes*,
   546 F.3d 1066 (9th Cir. 2008) ...............................................................18

*Van Zanen v. Qwest Wireless, LLC*,
   522 F.3d 1127 (10th Cir. 2008) .............................................................33

Plaintiff Bradley C. Smith, suing derivatively on behalf of Oppenheimer Gold & Special Minerals Fund (hereinafter the "Trust"), respectfully submits this opposition to the motion to dismiss the complaint filed by OppenheimerFunds Distributor, Inc., William F. Glavin, and John V. Murphy ("Motion").

## PRELIMINARY STATEMENT

This is a shareholder derivative action, filed on behalf of the Trust, a Massachusetts business trust registered with the SEC as an open-end management investment company (mutualfund) under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq*. The action seeks to void certain contractual obligations by which Trust assets are being used to pay asset-based compensation to broker-dealer firms holding Trust shares in brokerage accounts.

Defendants acknowledge that if a broker-dealer firm makes arrangements with its customer to receive compensation in the form of an ongoing fee at the rate of 1% per year of the value of the mutual fund assets held in the customer's brokerage account, *deducted by the broker-dealer*, that would be a violation of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-1 *et seq*., and the compensation payments would be *unlawful. See* Motion at 30 (citing *Financial Planning Association v. SEC*, 482 F.3d 481 (D.C. Cir. 2007)).

However, according to defendants, if the same broker-dealer firm makes arrangements with the mutual fund to receive compensation in the form of an ongoing fee at the rate of 1% per year of the value of the mutual fund assets held in the customer's brokerage account, *deducted by the mutual fund,* then *that* asset-based compensation arrangement is *lawful.*

Defendants do not contest that, in both arrangements, the broker-dealer is performing identical services (a package of brokerage services and investment advice) to the account. Nor do defendants contest that the form of compensation is identical (ongoing payments accrued at a set percentage of assets held in the account -- *i.e.,* "asset-based compensation"). Although in each arrangement there are different service firms involved in processing the payments,

defendants do not contest that the result is identical: the investor pays at the rate of 1% per year and the broker-dealer receives that money.

Despite the similarities (plaintiff would say equivalence) of the two arrangements, defendants assert they are distinguishable based on the "intent" and "nature and purpose" of the compensation payments. *See* Motion at 14, 28. According to defendants, the "intent" of the payments is ascertained by looking at whether the payor has ever "publicly" said (*see* Motion at 14) that the purpose of the payments is "*for* investment advice," *see* Motion at 29 (emphasis in original) or, stated slightly differently, whether the payor has "contemplate[d]" or "suggest[ed]" that the compensation "represents a payment for investment advice." *See* Motion at 14, 29. Defendants' approach represents a classic inquiry into the payor's *subjective intent.*

Therefore, as defendants frame the issue, the Advisers Act applies to the compensation arrangement at issue *only* if the defendants *intend* it to apply. That position differs decisively from plaintiff's contention: that the Advisers Act applies based on *objective* factors that have consistently governed the treatment of accounts at broker-dealer firms for the last 70 years -- *i.e.,* the services performed and the form of compensation received in connection with the customer account.

Based on their novel legal standard, defendants contend that since the Trust's payments are paid out of Trust assets pursuant to SEC Rule 12b-1, 17 C.F.R. § 270.12b-1, and are for "distribution-related activities" as allowed by Rule 12b-1, the payments are therefore *not* compensating broker-dealers "for services to customers." *See* Motion at 1, 30. Defendants accordingly are resting their entire argument here on their factual assertion that Rule 12b-1 fees are *not* being used "*for* investment advice." *See* Motion at 28 (emphasis in original).

Initially, of course, plaintiff submits that resolution of such factual issues would be improper on a motion to dismiss. But even assuming the Court was in a fact-finding mode, defendants have already admitted that their argument is factually false. According to defendant

John V. Murphy: "**As far as 12b-1 fees are concerned, it will go a long way if we just call them what they are, which are a fee for advice.**"[1]

Similarly, the trade group for independent directors/trustees of mutual funds, the Independent Directors Council (IDC), has told the SEC that: "**Today, the overwhelmingly predominant use (98%) of 12b-1 fees is for professional advice (initial and ongoing) and shareholder servicing.  Only a fraction (2%) of 12b-1 fees are used by funds for promotion, advertising and other miscellaneous expenses.**"[2]  The IDC proposed in a comment letter to the SEC that Rule 12b-1 fees be given a proper label with "descriptive terminology" -- *i.e.*, calling it, in their words, a "**third-party advice**" fee.[3]

Defense counsel for the movants, Dechert LLP, when giving sworn testimony before Congress, also have said that 12b-1 fees are for compensating advice.  In 2004, Paul Stevens, a Dechert partner, stated that the purpose of the "**distribution (12b-1) fee**" is "**to cover costs such as compensating broker-dealers, financial planners and other financial professionals for investment advice and other services they provide directly to investors**."[4]

Mr. Stevens also testified that "**investors are receiving professional advice or other services from financial intermediaries when investing in mutual funds.  Rule 12b-1 has**

---

[1] *See* Sullivan, "Oppenheimer's Murphy, 'Call 12b-1 Fees What They Are,'" *Boomer Market Advisor*, May 28, 2008, attached as Ex. 1 to Declaration of Janine Pollack (Pollack Decl.), submitted herewith.  In addition to serving as an affiliated Trustee, Mr. Murphy was chairman and CEO of OppenheimerFunds, Inc. (parent of OppenheimerFunds Distributor) and he also was chairman of the Investment Company Institute (ICI), the national trade association for the mutual fund industry, when he made that statement.  As indicated by the title of the article, he was not just making a casual assertion.  He was speaking both for Oppenheimer and as the official spokesperson for the American mutual fund industry.

[2] *See* IDC letter to SEC dated July 19, 2007, at 2 n. 3 (citing an ICI study).  *See* www.sec.gov/comments/4-538/4538-277.pdf.

[3] *Id.* at 6; *see also* ICI Report Of The Working Group on Rule 12b-1 dated May 2007 at 9 (recommending to the SEC that "**12b-1 fees should be listed in the prospectus fee table using tailored, straightforward, descriptive terms such as `third-party advice'**[.]") (available at www.ici.org/pdf/rpt_07_12b-1.pdf).  Defendant John V. Murphy was one of the 11 members of the ICI Working Group on Rule 12b-1.

[4] Statement of Paul S. Stevens, Partner, Financial Services Group, Dechert LLP, Before the Senate Governmental Affairs Subcommittee on Financial Management, the Budget, and International Security, January 27, 2004, at 3 (Pollack Decl. Ex. 2).

**made it possible for funds to provide investors with a choice of how and when to pay for these services**."[5]  The Dechert law firm features this last statement on its current web site at www.dechert.com, as part of the firm's marketing of its expertise to the mutual fund and broker-dealer industries.[6]

In a comment letter to the SEC, another Dechert partner quoted approvingly from a 2003 GAO Report explaining that Rule 12b-1 provides investors with "**an alternative way of paying for investment advice and purchases of fund shares**."[7]

A third Dechert partner is quoted in a trade journal article stating that investors "**want a 12b-1 arrangement because they want the advice and counseling**."[8]

Even though, as demonstrated above, defendants and defense counsel do not believe a word of it, their motion to dismiss quotes the assertion from the recent decision in *Smith v. Franklin/Templeton Distributors*, No. 09-4775, 2010 U.S. Dist. LEXIS 56516 at *21 (N.D. Cal. June 8, 2010), that Rule 12b-1 fees are *not* used "for services to customers."  Motion at 30.  The *Franklin/Templeton* court adopted that factual assertion on a motion to dismiss, without any factual record, and used it to conclude erroneously that the Advisers Act does not apply to asset-based compensation payments.  The *Franklin/Templeton* court invited amendment of the complaint and will be able to revisit the matter -- including, if facts become germane, the contrary evidence[9] -- in light of an Amended Complaint that was filed on July 7, 2010.

Defendants' remaining arguments are also without merit.  The Advisers Act prohibits payments to unregistered investment advisers, so the payments at issue are unlawful.  Nothing in

---

[5] *Id*. at 11.

[6] *See* Pollack Decl., Ex. 3 (retrieved on July 26, 2010).

[7] Comment letter from Dechert LLP to the SEC dated June 18, 2007 (available at http://www.sec.gov/comments/4-538/4538-71.pdf) *quoting* "Mutual Funds: Greater Transparency Needed In Disclosures To Investors," GAO Report 03-763 (June 2003).

[8] *See* "Sun to Set on 12b-1?," *Securities Industry News*, October 11, 2004.  Pollack Decl., Ex. 4.

[9] Franklin Templeton's own web site prominently states that mutual funds with Rule 12b-1 fees are designed for investors that "**prefer to 'pay as they go' for professional investment advice.**" *See* www.franklintempleton.com/retail/pages/generic_content/education/fund_basic/about/share_cl_options.jsf.

SEC Rule 12b-1 overrides the concurrently applicable Exchange Act and Advisers Act requirements.  The core purpose of the ICA is to prevent mutual fund assets from being used for improper purposes, such as the payments plaintiff contends are unlawful in this case.  The purpose of the ICA's contract voiding provision, Section 47(b), is to ensure as a matter of federal law that a regulated party's duties under the ICA will prevail over any contrary contractual obligations; definitive U.S. Supreme Court authority squarely rejects defendants' specious argument that the violations underlying the contract-voiding request must themselves be subject to private rights of action.

In sum, the Complaint adequately alleges a claim for contract voiding under Section 47(b) and the motion to dismiss should be denied.

## BACKGROUND:  MUTUAL FUNDS, BROKER-DEALERS, AND ASSET-BASED COMPENSATION

The Advisers Act was enacted with the express purpose of supplementing Exchange Act regulation of broker-dealers that receive asset-based compensation. Contrary to the impression defendants seek to convey, nothing in SEC Rule 12b-1 conflicts with the statutory regime of the Advisers Act.

### A.    Historical Context

Broker-dealer firms execute the purchase and sale of securities.[10]  Historically, broker-dealer firms elected to structure their compensation in the form of transactional commissions on trades in order to facilitate anticompetitive price fixing.[11]  Broker-dealers provide investment

---

[10] A "broker" is defined in the Securities Exchange Act of 1934 ("Exchange Act") as "any person engaged in the business of effecting transactions in securities for the account of others" and a "dealer" is defined as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise."  15 U.S.C. §§ 78c(a)(4)(A), (5)(A).  A firm selling mutual fund shares to members of the public is acting as a broker.  Such firms are commonly referred to as "broker-dealers," and the associated persons (individuals) employed by the firm are referred to as "registered representatives."

[11] "The practice of fixing commission rates on stock exchanges in the United States is generally traced back to the so-called Buttonwood Tree Agreement of 1792."  *See Certain Broker-Dealers Deemed Not To Be Investment Advisers*, SEC Release No. 34-51523, 70 Fed. Reg. 20424, 20431

advice as an auxiliary component of traditional brokerage services (generally understood to include transaction execution, custodial and recordkeeping services), through customer accounts known as brokerage accounts.[12]

Beginning in 1920, some broker-dealers began offering investment advice through "advisory accounts," which were usually discretionary accounts that charged "a fee based on a percentage of the market value of the cash and securities in the account being supervised," to compete with services offered by "independent investment counseling firms" providing investment advice to accounts, also using that form of compensation arrangement.[13]

In 1934, the Exchange Act supplanted state-law blue-sky regulation by requiring broker-dealers to register with the SEC, a new federal regulatory agency created by the Exchange Act, and comply with SEC regulation. Four years later, the Exchange Act was amended to allow the SEC to delegate most regulation of broker-dealers to the NASD (now known as FINRA).

In 1940, Congress enacted the Advisers Act, which mandates certain disclosure, liability, recordkeeping and conflict management requirements to protect the clients of professional investment advisers. The Advisers Act defines an "investment adviser" broadly as "**any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]**" *See* Section 202(a)(11), 15 U.S.C. § 80b-2(11).

Under that definition, all broker-dealers advising retail customers (whether through brokerage accounts or advisory accounts) are "investment advisers," because they provide investment advice and they receive compensation.

---

n. 74 (Apr. 19, 2005) ("2005 Final Rule Release") (available at http://www.sec.gov/rules/final/34-51523.pdf).

[12] *Id*. at 20428.

[13] *Id*. at 20428-29.

Although the term "compensation" is not defined in the Advisers Act, it has consistently been interpreted to mean *any economic benefit* received by the broker-dealer in connection with a customer account.  As the SEC has stated:

> This compensation element is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing. It is not necessary that a person who provides investment advisory and other services to a client charge a separate fee for the investment advisory portion of the total services.  The compensation element is satisfied if a single fee is charged for a number of different services. . . . . It is not necessary that an adviser's compensation be paid directly by the person receiving investment advisory services, but only that the investment adviser receive compensation from some source for his services.

SEC Release No. IA-1092, 1987 SEC LEXIS 3487, at *14-15 (October 8, 1987).

Congress was aware that all broker-dealers fall within the definition of "investment adviser" (since investment advice has always been an auxiliary component of traditional brokerage services) -- so it included in the Advisers Act a statutory exclusion, known as the "Broker-Dealer Exclusion," excluding certain broker-dealers from the definition of investment adviser, *i.e.,* "**any broker or dealer whose performance of such services [advice] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor.**"  15 U.S.C. § 80b-2(11)(C).

According to an often cited SEC opinion letter issued in 1946, "the broker-dealer exception `amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business and that it would be inappropriate to bring them within the scope of the [Advisers Act] merely because of this aspect of their business.'"[14]

---

[14] *See* 2005 Final Rule Release, 70 Fed. Reg. at 20425, *quoting Opinion of the General Counsel Relating To Section 202(a)(11)(C) of the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 2 (Oct. 28, 1940), 11 Fed. Reg. 10996 (Sept. 27, 1946).

The terms "solely incidental" and "no special compensation" in the Broker-Dealer Exclusion are not defined in the statute, but for 70 years, the SEC and the courts have given those terms consistent meanings, based on what Congress intended by that language in 1940.

The term **"solely incidental"** means "the advisory services rendered to an account are in connection with and reasonably related to the brokerage services provided to that account.  This understanding is consistent with the legislative history of the Advisers Act, which indicates Congress' intent to exclude broker-dealers providing advice as part of traditional brokerage services."  *See* SEC Release No. IA-2340, 2005 SEC LEXIS 25 at *70 (Jan. 6, 2005).

The term **"no special compensation"** means the broker-dealer many not receive any form of compensation other than transactional commissions.  *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (Section 202(a)(11)(C) of the Advisers Act applies to broker-dealers "insofar as their advice is merely incidental to **brokerage transactions for which they receive *only* brokerage commissions**") (emphasis added).

The "no special compensation" prong of the Broker-Dealer Exclusion is a "'bright-line' test.  *See* 2005 Final Rule Release, 70 Fed. Reg. at 20431 n.76.  Special compensation means the receipt of any non-transactional compensation.  *Id.* at n.75 ("At the time the Advisers Act was enacted, Congress understood 'special compensation' to mean compensation *other than* commissions.") (emphasis in original).

A broker-dealer firm may, if it wishes, comply with the Advisers Act by registering as an investment adviser (the firm is then commonly referred to as a "dual registrant").  After enactment of the Advisers Act in 1940, many broker-dealers became dual registrants, and a large percentage are dual registrants today.  The Advisers Act's applicability has always been determined on an account-by-account basis.  *See* SEC Release No. IA-2652, 2007 SEC LEXIS 2229 at *7 (Sept. 24, 2007) (proposal to codify a long-standing SEC interpretation that a broker-dealer "**is an investment adviser solely with respect to those accounts for which it provides services or receives compensation that subject the broker-dealer to the Advisers Act**.").  The inquiry goes "**not to whether the firm is subject to the Advisers Act, but to which of its**

**accounts must be treated as advisory accounts**." *See* 2005 Final Rule Release, 70 Fed. Reg. at 20425.  Broker-dealers offering an advisory account to a customer that includes brokerage services must comply with both the Exchange Act (including FINRA rules) and the Advisers Act requirements.

As the law has developed, the Advisers Act has been interpreted and applied to ensure that customers who pay for an ongoing relationship receive the Advisers Act benefits of non-conflicted advice, full disclosure by the adviser of any third-party compensation arrangements, and protections by virtue of fiduciary-level duties imposed on the adviser -- far different from the mere transactional "salesman" duties of brokers.

Accordingly, the express purpose of the Advisers Act is to supplement Exchange Act regulation of customer accounts at broker-dealers for accounts that fail to satisfy either one of the two prongs of the Broker-Dealer Exclusion.  Therefore, if a broker-dealer receives any "special compensation" in connection with a customer account, the Broker-Dealer Exclusion does not apply and the account must be treated as an advisory account subject to the Advisers Act.

### B.   The Rise and Fall of SEC Rule 202(a)(11)-1, Which Previously Permitted Broker-Dealers to Receive Asset-Based Compensation in Connection With Brokerage Accounts

On May 1, 1975, a 183-year-long era ended when Congress and the SEC eliminated fixed commission rates.[15]  By the 1990s, price competition from discount broker-dealers (and especially from "execution-only" accounts, which evolved to become inexpensive electronic trading accounts) reduced the prevailing transactional commission rates in the marketplace,[16] while a roaring bull market was causing asset values, and hence the earnings of registered investment advisers receiving asset-based compensation, to climb.

---

[15] *See* Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97, 107-08 (1975) (enacting Section 6(e)(1) of the Exchange Act, 15 U.S.C. § 78f(e)(1)).

[16] *See generally* Silber, *The Great Unfixing*, Research Magazine (May 1, 2010) (as commissions plunged due to fierce price competition, broker-dealers had no choice but to turn to asset-based compensation) (available at http://www.researchmag.com/Issues/2010/May-1-2010/Pages/The-Great-Unfixing.aspx).

As a result, broker-dealers coveted asset-based compensation.  Yet they did not want the accompanying fiduciary liability and conflict disclosure requirements of the Advisers Act.  The industry convinced the SEC that the statutory bar against "special compensation" in order to qualify for exclusion from the Advisers Act was an anachronism, and that it would be good policy for broker-dealers to be able to receive asset-based compensation on brokerage accounts -- especially because asset-based compensation eliminates the incentive to churn accounts for transactional commissions.  Throughout the 1990s, the SEC openly encouraged a shift to asset-based compensation for broker-dealers.  An SEC-sponsored study in 1995 concluded that asset-based compensation was a "best practice" for broker-dealers.  *See* Report of the Committee on Compensation Practices (April 10, 1995) (a/k/a the "Tully Report") available at www.sec.gov/news/studies/bkrcomp.txt.[17]

Taking advantage of the permissive regulatory environment during the 1990s, mutual fund companies, including Oppenheimer, introduced new share classes that reduced or eliminated the upfront sales load (commission) in favor of ongoing asset-based compensation to broker-dealers, to be paid out of Rule 12b-1 fees.[18]  Prior to the 1990s, some mutual fund companies offered a share class that had no upfront sales load, but the mutual fund company advanced a transactional sales commission to the broker-dealer and then recovered it through Rule 12b-1 fees or a contingent deferred sales charge.  The asset-based compensation in those "spread load" arrangements was not paid to the retail broker-dealer.[19]

---

[17] The Tully Report also states: "The most important role of the [broker-dealer] registered representative is, after all, to provide investment counsel to individual clients, not to generate transaction revenues.  The prevailing commission-based compensation system inevitably leads to conflicts of interest among the parties involved."  *Id*. at 3.

[18] *See* Press Release,"Classes of Shares Now Available From Quest For Value Distributors" (October 4, 1993) (Pollack Decl., Ex. 5).

[19] *See* Unofficial Transcript of Rule 12b-1 Roundtable, SEC Division of Investment Management, June 19, 2007 at 40 (former director of the SEC Division of Investment Management recounts that in the 1980's, the practice by mutual fund companies was that "the distributor had to advance the sales commission, and it would take years to get it back"); *id*. at 39 ("the fund would pay what, at the time, seemed like an extraordinarily high 12b-1 fee to recompense the distributor for having advanced the sales commission") (available at www.sec.gov/news/openmeetings/2007/12b1transcript-061907.pdf)

In 1999, the SEC moved to formally legalize receipt of asset-based compensation by broker-dealers that did not want to provide advisory accounts subject to the Advisers Act.  The SEC issued a no-action position, [20] which the industry interpreted to be retroactive, and a proposed regulation, that acted as an exception to the statutory exclusion, *i.e.* it allowed broker-dealers to receive "special compensation" notwithstanding the "no special compensation" provision in the Broker-Dealer Exclusion.[21]  The SEC invoked what it believed to be its authority under another statutory exclusion in the Advisers Act permitting the SEC to designate by regulation or order "such other persons not within the intent of this paragraph" to be excluded from the definition of investment adviser.  *See* 1999 Rule Proposal at 14 (*citing* 15 U.S.C. § 80b-2(11)(F)).  The no-action position and the proposed new regulation -- SEC Rule 202(a)(11)-1, 17 C.F.R. § 275.202(a)(11)-1 (the "Rule") -- effectively eliminated the "special compensation" prong of the Broker-Dealer Exclusion.

The mutual fund industry cheered these developments, which resolved any legal uncertainty surrounding their new Rule 12b-1 asset-based compensation arrangements.  For instance, the law firm of WilmerHale (then Wilmer, Cutler & Pickering) told its mutual fund and broker-dealer clients that, while "[i]nvestment companies have used asset-based fees under rule 12b-1 plans as compensation for brokerage services, especially for the sale of so-called 'B' and 'C' shares," and although this form of compensation could "involve special compensation," the SEC's "proposed rule 202(a)(11)-1 would provide a clean solution to any questions about the

---

[20] The no-action position states that "the Division of Investment Management will not recommend, based on the form of compensation received, that the Commission take any action against a broker-dealer for failure to treat any account over which the broker-dealer does not exercise investment discretion as subject to the [Advisers] Act."  *See* Certain Broker-Dealers Deemed Not To Be Investment Advisers, Release Nos. 34-42099, IA-1845, 1999 SEC LEXIS 2356 at *3 (Nov. 4, 1999) (1999 Rule Proposal).

[21] *Id*. The proposed rule stated, in pertinent part, that a broker-dealer "will not be deemed to be an investment adviser based solely on its receipt of special compensation, provided that. . . any investment advice provided by the broker or dealer with respect to accounts from which it receives special compensation is solely incidental to the brokerage services provided to those accounts."

applicability of the term 'special compensation' by providing exemptions from the definitions of 'investment adviser' and 'special compensation' for asset-based compensation[.]"[22]

On April 19, 2005, the SEC issued a final Rule.  In pertinent part, the Rule stated that a broker-dealer "**will not be deemed to be an investment adviser based solely on its receipt of special compensation**" if certain disclosures were provided to the customer, including a disclosure that "Your account is a brokerage account and not an advisory account."[23]  The Rule also codified several long-standing SEC interpretations of the "solely incidental" prong of the Broker-Dealer Exclusion, including an interpretation that a broker-dealer provides advice that is not solely incidental to brokerage services if it "charges a separate fee, or separately contracts, for advisory services" or "exercises investment discretion."  *See* 17 C.F.R. § 275.202(a)(11)-1(b)(1) and (b)(3).

The Rule was subsequently vacated in its entirety by the Court of Appeals for the D.C. Circuit in *Financial Planning Association,* 482 F.3d at 493.  The court ruled that the SEC lacked the authority to contradict the Broker-Dealer Exclusion and its prohibition against asset-based compensation.  *Id*.  The decision is also significant because it reaffirms that asset-based compensation is "special compensation" under the Broker-Dealer Exclusion.  *Id*. at 488 ("**By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.**").[24]

---

[22] *See* Client Newsletter, Wilmer, Cutler & Pickering, "Investment Company and Investment Advisers Act Developments," vol 7, no. 4 (November 9, 1999) (Pollack Decl., Ex. 6).

[23] *See* 2005 Final Rule Release, 70 Fed. Reg. at 20454.

[24] The dissenting opinion agreed with the majority's holding that asset-based compensation is "special compensation."  *Financial Planning Association*, 482 F.3d at 494 ("a broker-dealer who receives any kind of compensation other than commissions does not come within the [Broker-Dealer Exclusion], even if he, too, provides advice solely as an incident to his business as a broker-dealer.").  However, unlike the majority, the dissenting judge would have allowed the SEC to authorize "special compensation," based on the judge's view that the "other persons" language in the statutory exclusion that allows the SEC to designate "other persons" for exclusion from the Advisers Act is ambiguous, and that the SEC had made a reasonable interpretation of its rulemaking authority to classify broker-dealers that receive "special compensation" as "other persons."  *Id*.  Therefore, the *Financial Planning Association* decision

The SEC declined to appeal, and, at the agency's request, the court stayed its mandate for six months, until October 1, 2007, to allow for an orderly transition of brokerage accounts into advisory accounts. *See* 2007 U.S. App. LEXIS 15169 (D.C. Cir. June 25, 2007). An effort by the industry to have Congress legislatively overrule the decision by deleting the "special compensation" prong of the Broker-Dealer Exclusion was unsuccessful.[25]

Accordingly, for nearly two decades, the mutual fund and broker-dealer industries flourished from asset-based compensation arrangements that, as it turned out, the SEC lacked authority to condone. As of October, 1, 2007, all brokerage accounts receiving asset-based compensation should have been converted to advisory accounts, when avoidance of the statutory ban on asset-based compensation for brokerage accounts was terminated by *Financial Planning Association*. However, mutual fund companies that distribute shares through broker-dealer firms have obstinately resisted compliance and have continued their unlawful asset-based compensation arrangements.

### C.    Recent Development:  The SEC Proposes to Rescind Rule 12b-1

On July 21, 2010, the SEC released for public comment a proposal to rescind Rule 12b-1 in its entirety.[26] Under the proposal, Rule 12b-1 will be replaced by new rules that allow the use of fund assets to pay "transaction-based compensation"[27] to broker-dealers. The amount of any "deferred sales load" charged to fund investors can be no higher than the amount of the "reference load,' as defined in the new rules. The "reference load" is "a specified percentage of

---

reflects that the SEC, the D.C. Circuit Court of Appeals majority, and the dissenting judge were all in agreement that asset-based compensation is "special compensation."

[25] Burke, "The Hot Seat," *Registered Representative* at 44 (September 2007) ("for months, Merrill [Lynch] and the securities industry lobby, the Securities Industry and Financial Markets Association (SIFMA), had been aggressively lobbying for Congress to intervene") (Pollack Decl., Ex. 7).

[26] *See* SEC Release Nos 33-9128, 34-62544, IC-29367 (July 21, 2010) (the "Release"), available at http://www.sec.gov/rules/proposed/2010/33-9128.pdf .

[27] *Id*. at 47 n. 168.

the net asset value of the offering price at the time of purchase[,]"[28] including any breakpoint discounts that the investor is entitled to receive.

For instance, under the proposal, if an investor would have had to pay a 2% upfront sales load based on the sales load breakpoint discount schedule in effect for the fund,[29] then, as an alternative, the investor could be charged a deferred sales charge that cannot exceed 2% for one year, or 1% for two years, or 0.50% for four years, for example. The proposal also allows broker-dealers, rather than mutual funds, to set the amount of the front-end reference load, to introduce price competition to the sale of mutual fund shares.

The Release refers to the pendency of this litigation, and also discloses that, beginning in 2007, numerous prominent experts have urged the SEC to address the Advisers Act violation that occurs when Rule 12b-1 fees are paid to broker-dealers, in light of the *Financial Planning Association* decision.[30]  In the Release, the SEC requests public comment on these issues and on whether its proposed new rules will "appropriately address" the Advisers Act issue "by requiring a nexus between the sale of a share of a mutual fund and the amount of ongoing sales charges an intermediary's customer pays through the fund."[31]

## FACTS ALLEGED IN THIS CASE

Plaintiff Bradley C. Smith is invested in Class C shares of the Oppenheimer Small-& Mid-Cap Value Fund, a series of the Trust, and is therefore a shareholder in the Trust. Complaint ¶ 10.  Plaintiff has been a shareholder in the Trust continuously since June 9, 2006.

---

[28] *Id.* at 258; Proposed Rule 17 C.F.R. § 270.6c-10(a)(i).

[29] The current breakpoint schedule in effect for the Trust has discounts on the 5.75% sales load beginning on a person's investments of $25,000 or more (based on total aggregate investments in Oppenheimer mutual funds).  The sales load on investments aggregating between $500,000 to $1 million is 2%, for instance. *See* Zack Decl, Ex. C, page 22, prospectus excerpt dated June 25, 2010, attached to Motion.  Under the Trust's current distribution arrangements, broker-dealers evade the discount schedule altogether by selling share classes - such as Class C shares - with high Rule 12b-1 fees rather than upfront sales loads.  The new rule would put an end to that abuse.

[30] *Id.* at 125 n. 372.

[31] *Id*. at 125.

Complaint ¶ 10.  Plaintiff's shares are held in a brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated, a broker-dealer.  Complaint ¶ 10.  Merrill Lynch provides traditional brokerage services, of which investment advice is an auxiliary component.  Complaint ¶ 25 (broker-dealer firms make securities recommendations, conduct suitability reviews, and otherwise provide investment advice to their customers).

The Trust has elected to act as the distributor of its own shares, *see* SEC Rule 12b-1, 17 C.F.R. § 270.12b-1(a)(2), and is financing distribution activities out of Trust assets, including the costs of distributing prospectuses, and compensating broker-dealers for sales and servicing shareholders, as allowed by SEC Rule 12b-1.  Complaint ¶ 48.

Pursuant to Rule 12b-1 distribution plans and a distribution agreement, the Trust is making asset-based compensation payments to defendant OppenheimerFunds Distributor, which in turn forwards them to retail broker-dealers.  The payments are calculated based on the average daily net asset values of the particular Trust shares held in each respective broker-dealer's customer accounts.  Complaint ¶ 49.  These payments are ongoing, which means that they continue to be made to the broker-dealer for as long as the shareholder owns Trust shares held in an account serviced by that broker-dealer.  *Id.*  In addition, OpenheimerFunds Distributor makes "revenue sharing" payments to broker-dealers based on daily net asset values of shares held in customer accounts, which are also ongoing.  *Id.*

These asset-based compensation payments constitute "compensation" for purposes of the Advisers Act, because they constitute an economic benefit received by the broker-dealers in connection with customers' accounts.  *Id.*  Since the claims in this action involve asset-based compensation paid to broker-dealers with respect to Trust shares held in brokerage accounts, the broker-dealer is either not registered under the Advisers Act or is otherwise not providing an advisory account, and therefore the payments are unlawful under *Financial Planning Association* and constitute an improper use of Trust assets.  The absence of advisory accounts deprives Trust shareholders of the protections and benefits of the Advisers Act, to which they are entitled by

law.  Complaint ¶ 51.  The Broker-Dealer Exclusion cannot and does not apply because the payments are in the form of asset-based compensation.  *Id.*

Both the Trust and OppenheimerFunds Distributor are regulated parties under the ICA, *see* Complaint ¶¶ 38-40, and are precluded from using Trust assets for unlawful payments, Complaint ¶¶ 49-54, or from otherwise failing to act in the best interests of Trust shareholders. When the broker-dealer is not registered as an investment adviser and the account is not an advisory account, the Trust's contractual obligation to make these payments to OppenheimerFunds Distributor, for disbursement to the retail broker-dealers, conflicts with its fiduciary and legal compliance obligations under the ICA.  Complaint ¶¶ 63-68.

By letter dated January 8, 2009, plaintiff made a demand on the board of the Trust to cause the Trust and its service providers to cease funding and paying asset-based compensation to broker-dealers holding Trust shares in brokerage accounts, to restore certain of such payments made in the past, and to remedy the Trustees' breaches of their fiduciary duties of loyalty and care and their waste of Trust assets.  *See* Complaint, Ex. 1.  By letter dated November 12, 2009, the secretary to the Trust forwarded to plaintiff's counsel a copy of a resolution adopted by the board of the Trust stating that the board, "in the exercise of its business judgment and in light of its fiduciary duties under state and federal law, has concluded not to take the actions recommended to it in the Milberg Letter."  *See* Complaint, Ex. 5.

Plaintiff subsequently filed this shareholder derivative action on behalf of the Trust on March 19, 2010.  A motion to dismiss by OppenheimerFunds Distributor and the affiliated Trustees was timely filed on June 25, 2010.

## LEGAL STANDARD

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted).  A court "accept[s] all the well-pleaded

allegations of the complaint as true" and "construe[s] them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) *quoting David v. City & County of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996).

The complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). As explained below, the Complaint in this case is legally sufficient and should be sustained.

## ARGUMENT

## I.    INTRODUCTION

The legal issues raised by defendants' motion fall into four categories: (i) whether the asset-based compensation payments to broker-dealers violate the Advisers Act; (ii) if so, whether the Trust's use of Trust assets for such unlawful payments constitutes a proper use of Trust assets; (iii) whether the ICA prohibits such improper use of Trust assets; and finally (iv) whether Section 47(b) of the ICA enables the Trust in this lawsuit to void its contractual undertakings to make payments that conflict with its duty to comply with the ICA.

Defendants' motion argues that the broker-dealer compensation payments only implicate the Exchange Act , which regulates broker-dealers. However, the Advisers Act supplements Exchange Act regulation of broker-dealers when asset-based compensation is received in connection with a customer account.

Defendants would never make Rule 12b-1 payments to a firm that is not properly registered under the Exchange Act as a broker-dealer. Defendants have extensive compliance procedures in place to make sure that this does not happen. Compliance with the Advisers Act is of no less importance than compliance with the Exchange Act. The defendants have equally compelling compliance duties to be certain that Trust assets are not used to make asset-based

compensation payments to broker-dealer firms that are not dual registrants or otherwise are failing to hold Trust shares in advisory accounts.

Prior to the *Financial Planning Association* decision in 2007, it was universally assumed that the SEC had authority to allow broker-dealers to receive asset-based compensation in connection with brokerage accounts. Defendants refer to those years as a "settled regulatory regime," and argue that plaintiff is attacking Rule 12b-1.

However, Rule 12b-1 is not the only law implicated by the payments, and this litigation is not attacking Rule 12b-1. Defendants have not articulated any conflict between Rule 12b-1 and the Advisers Act.[32] For example, the Trust could adopt a distribution plan to sell and service Trust shares through pizza parlors and other retailers with access to the public. That would be entirely appropriate and permitted under Rule 12b-1, because it would promote Trust sales and/or keep shareholders from redeeming. But the pizza parlor distribution plan would still need to comply with the Exchange Act, and depending on the form of compensation, the Advisers Act as well. Compliance with Rule 12b-1 is not the dispositive fact that defendants argue it to be in their motion; in fact, it is irrelevant to this lawsuit.

## II.   THE PAYMENTS AT ISSUE ARE UNLAWFUL

### A.   All Broker-Dealers Fall Within the Broad Definition of Investment Adviser

The definition of "investment adviser" is "any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]" 15 U.S.C. § 80b-2(11). The Complaint alleges that all broker-dealers are "investment advisers" because investment advice is an auxiliary component of traditional brokerage services. Complaint ¶ 25 (broker-dealer firms make securities recommendations, conduct suitability reviews, and otherwise provide investment

---

[32] Even if there were a conflict, Rule 12b-1 is a regulation, and therefore would yield to the Advisers Act. *See United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008) ("a regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides.").

advice to their customers).  Defendants' argument that the Complaint is deficient because it does not allege that plaintiff or any other Trust shareholder received investment advice, *see* Motion at 27-28, is accordingly baseless.  The receipt of compensation by an investment adviser that has not registered under the Advisers Act is unlawful.  *See* 15 U.S.C. § 80b-3(a) (unlawful for any investment adviser that has not registered under the Advisers Act to use the means of interstate commerce in connection with his or her business).

The Complaint also alleges that the broker-dealers received "compensation" in connection with accounts holding Trust shares.  *See* Complaint ¶ 49 (payments are calculated based on the average daily net asset values of the particular shares held by each broker-dealer's customer account).  As discussed above, the compensation element is satisfied by any economic benefit received in connection with a customer account to which investment advice is included in the package of services provided.  *See*, *supra* at 7, SEC Release No. IA-1092, 1987 SEC LEXIS 3487, at *14-*15 (Oct. 8, 1987)).  Accordingly, whether the payments are specifically labeled to be "*for* investment advice" (emphasis in original), *see* Motion at 28, as defendants construe the test, is legally irrelevant.  Receipt of third-party payments such as sales commissions, for instance, is unequivocally "compensation" for purposes of the Advisers Act. [33]  The label on the fee, the purpose of the fee, the intent of the fee, the form of the fee, and the source of the fee are all legally irrelevant.  If the compensation is any economic benefit in connection with a customer

---

[33] *Id.*; *see also College Resource Network*, 1993 SEC No-Act. LEXIS 630 at *4 (Apr. 9, 1993) (the "compensation" element "is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or a combination of the foregoing.  Moreover, it is not necessary that the adviser's compensation be paid directly by the person receiving the investment advisory services; the adviser need only receive compensation from some source for his services."); *In re O'Brien Partners, Inc.*, Sec. Act Release No. 7594, IA-1772, 1998 SEC LEXIS 2318 at *21, *25 (Oct. 27, 1998) (firm providing investment advice that received third-party payments in connection with the account satisfies the compensation element of the definition of investment adviser, because there is no requirement that compensation be paid directly by the person receiving the investment advisory services).

account to which investment advice was a component of the package of services provided, then it is compensation for advice. [34]   The only issue remaining is whether a statutory exclusion applies.

### B.   The Broker-Dealer Exclusion Is Inapplicable If Asset-Based Compensation Is Received

Although it is not plaintiff's burden to plead and prove the non-applicability of every possible statutory exclusion,[35] plaintiff alleges in the Complaint that the Broker-Dealer Exclusion to the definition of "investment adviser" is inapplicable to broker-dealers receiving the asset-based compensation payments at issue.  *See* Complaint ¶¶ 25-29.

The Broker-Dealer Exclusion excludes certain broker-dealers from being deemed to be investment advisers, *i.e.,* "any broker or dealer whose performance of such services [advice] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."  15 U.S.C. § 80b-2(11)(C).

Defendants interpret the Broker-Dealer Exclusion to mean that broker-dealers can receive any form of compensation, so long as they do not receive compensation specifically for investment advice.  *See* Motion at 9, 28.

Defendants' interpretation is identical to what the invalidated SEC Rule stated.  The text of the invalidated Rule is that a broker-dealer "will not be deemed to be an investment adviser based solely on its receipt of special compensation" provided that "[a]ny investment advice provided by the broker or dealer with respect to accounts from which it receives special compensation is solely incidental to the brokerage service provided to those accounts[.]"  The Rule goes on to codify several long-standing SEC interpretations of "solely incidental,"

---

[34] Similarly, a registered investment adviser that executes securities transactions must become a dual registrant (*i.e.,* register as a broker-dealer), irrespective of whether the investment adviser is receiving no compensation specifically for the transactions.  *See PRA Sec. Advisors, L.P.*, 1993 SEC No-Act. LEXIS 387 (Mar. 3, 1993) (investment adviser receiving only asset-based compensation must nevertheless register as a broker-dealer if executing securities transactions).

[35] The general rule is that the party claiming the benefits of a statutory exclusion has the burden of proving its applicability.  *See United States v. First City Nat'l Bank*, 386 U.S. 361, 366 (1967).  Accordingly, in this case, it is defendants' burden to prove that the Broker-Dealer Exclusion applies, if defendants rely on it.

including that "[a] broker or dealer provides advice that is not solely incidental. . . to the
brokerage services provided to accounts from which it receives special compensation within the
meaning of paragraph (a)(1)(i) of this section if the broker or dealer. . . charges a separate fee, or
separately contracts, for advisory services[.]"  *See* 2005 Final Rule Release, 70 Fed. Reg. at
20454; 17 C.F.R. § 275.202(a)(11)-1.

Accordingly, under the Rule, a broker-dealer can receive any form of compensation,
including asset-based compensation, so long as the broker-dealer did not separately contract to
be paid for investment advice.  The D.C. Circuit in *Financial Planning Association* invalidated
the Rule on the basis that the Rule conflicted with the Broker-Dealer Exclusion.  *See* 482 F.3d. at
488 ("**By seeking to exempt broker-dealers beyond those who receive only brokerage
commissions for investment advice, the SEC has promulgated a final rule that is in direct
conflict with both the statutory text and the Committee Reports.**") (emphasis added).  The
statutory text is the "no special compensation" prong, and the Committee Reports constitute the
legislative history which states that "special compensation" means any compensation not in the
form of transactional commissions.[36]

Defendants' interpretation of the Broker-Dealer Exclusion thus is identical to the
invalidated Rule, and therefore is also "in direct conflict with both the statutory text and the
Committee Reports."  Defendants' interpretation would render the "no special compensation"
prong of the Broker-Dealer Exclusion superfluous.  The "solely incidental" prong already
prohibits broker-dealers from separately contracting to be paid for advice.[37]

---

[36] *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (Section 202(a)(11)(C) of the
Advisers Act applies to broker-dealers "**insofar as their advice is merely incidental to
brokerage transactions for which they receive *only* brokerage commissions**") (emphasis
added).

[37] *See also* 2005 Final Rule Release, 70 Fed. Reg. at 20434 n. 103 (stating that although the final
Rule allows broker-dealers to receive any form of compensation, under the Rule, broker-dealers
may not receive compensation specifically for advice:  "When the form of compensation
demonstrates that the advice is not solely incidental to brokerage, however, as in the case of
separate fees paid specifically for advice, the [Rule] will not be available.").

In the *Financial Planning Association* decision, the court majority, the dissenting judge, and the SEC were all in agreement that asset-based compensation is "special compensation" and is the subject of the statutory bar. *See supra*, at 12.[38] Defendants repeatedly acknowledge that the payments at issue are asset-based compensation to the broker-dealers. *See* Motion at 12 (stating that Rule 12b-1 fees are "asset-based as opposed to transaction-based"); 14 (stating again that Rule 12b-1 fees "are asset-based as opposed to transaction-based"); 29 ("all of the Rule 12b-1 Fees that the Fund pays to OFDI are 'asset-based'").

Therefore, if there ever was, prior to *Financial Planning Association*, a sliver of doubt about whether "special compensation" includes asset-based compensation, the law is now clear. Moreover, Congress subsequently declined to amend the Broker-Dealer Exclusion to remove the ban on "special compensation," despite an aggressive lobbying campaign. Accordingly, there is *no colorable basis,* in the wake of those developments, for defendants to argue here that broker-dealers may receive asset-based compensation in connection with brokerage accounts.

None of the cases defendants cite has anything to do with asset-based compensation, and none supports defendants' position. In *Thomas v. Metropolitan Life Ins. Co.*, No. 07-121, 2009 U.S. Dist. LEXIS 78014 (W.D. Okla. Aug. 31, 2009), the court applies the very same legislative history to the Advisers Act that was relied upon by the D.C. Circuit in *Financial Planning Association* (*i.e.,* the Broker-Dealer Exclusion is intended to exclude brokers "insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions"). *See id.* at *16. The broker-dealer in that case was held to have received transactional commissions. *Id.* The plaintiff -- relying on the broad initial definition of investment adviser in the IAA -- argued that this compensation was received in connection with an account to which investment advice was provided. The court agreed with the plaintiff that the

---

[38] *See also* Arthur B. Laby, *Reforming the Regulation of Broker-Dealers and Investment Advisers,*" 65 Bus. Law. 395, 417 (Feb. 2010) ("As a technical matter, the receipt of asset-based compensation has made the broker-dealer exclusion inapplicable to brokers receiving such compensation. After the *Financial Planning Association* decision, asset-based fees must be considered 'special compensation,' which vitiates application of the exclusion.").

"compensation" element of the Advisers Act was satisfied by the commissions, but went on to hold that there was no "special compensation," for purposes of the Broker-Dealer Exclusion, because there was no "charge to the customer beyond a traditional commission."  *Id.* at *27.  The court concluded that the plaintiff's argument in that case -- that all "compensation" was "special compensation" -- would render the Broker-Dealer Exclusion a statutory nullity, since no broker-dealer could ever satisfy the exclusion.  The case supports plaintiff's, not defendants', position here.

In *Luzerne County Retirement Board v. Makowski*, 627 F. Supp. 2d 506 (M.D. Pa. 2007), the "Plaintiff itself characterizes all of the compensation received by [broker-dealer] as commissions on investments" and the court was proceeding on that basis.  *See id.* at 573 n.71.

In *Kassover v. UBS AG*, 619 F. Supp. 2d 28 (S.D.N.Y. 2008), the defendant was "one of the largest underwriters of ARS [auction rate securities] and garnered significant fees for managing the auctions for ARS that they sold."  *Id.* at 30.  The plaintiffs, however, had retail brokerage accounts and they paid commissions to purchase ARS.  *Id.*  The accounts with the retail broker-dealer department of UBS had no connection to the underwriting department or the fees earned by that department.  The court rejected the investors' contention that UBS's underwriting earnings constituted "special compensation" to trigger the applicability of the Advisers Act to their brokerage accounts.  *Id.* at 34.  (Moreover, based on the facts as reflected in the opinion, the underwriting income would not have met the "compensation" element of the definition of investment adviser either, since there was no alleged connection to the brokerage accounts.)

In *SEC v. Kenton Capital, Ltd*, 69 F. Supp. 2d 1 (D.D.C. 1998), the opinion states that certain fees at issue, which were calculated as a percentage of the amount invested (*i.e.,* upfront commissions), were not "special compensation," but that another fee that was calculated as an ongoing percentage of profits earned in the account was not a commission and *did* constitute "special compensation."  *Id.* at 14.  Due to the receipt of non-commission compensation, the

court held that the defendant broker-dealers were investment advisers. *Id.* The *Kenton Capital* case, as with all of defendants' cases, plainly does not support their arguments here.

Defendants do not cite any precedent holding that broker-dealers can receive asset-based compensation in connection with a brokerage account.[39] This speaks for itself.

## III. UNLAWFUL PAYMENTS ARE AN IMPROPER USE OF TRUST ASSETS

The Complaint alleges that the core purpose of the ICA is to prevent the improper use of Trust assets, such as using Trust assets to perpetrate violations of the federal securities laws. *See* Complaint ¶¶ 38-47. Defendants do not dispute that the Trust, the Trustees, and OppenheimerFunds Distributor are directly regulated parties under the ICA, subject to Section 36(a), which sets forth a statutory fiduciary duty to act in the best interests of the Trust and its shareholders.[40] Defendants' only argument is that there are no private rights of action for damages under the ICA, but that fact is irrelevant. The regulated parties (the Trust, the Trustees, and OppenheimerFunds Distributor)[41] have a statutory obligation to comply with the ICA, irrespective of its remedy for enforcement or breach.

---

[39] The SEC has consistently applied the Advisers Act to any non-transactional compensation. *See Hugh Johnson & Co.*, 1976 SEC No-Act. LEXIS 420 (Feb. 22, 1976) (account fee of 0.25% per year is "special compensation" and automatically disqualifies account for the broker-dealer exclusion); *In re: Quest Capital Strategies, Inc.*, 1999 SEC LEXIS 727 at *42 (Apr. 12, 1999) (broker-dealer that retained the difference between interest rate promised to investors and return secured by investing their funds received "special compensation"); *Calton & Assocs., Inc.,* 1988 SEC No-Act. LEXIS 1348 (Oct. 11, 1988) (an asset-based compensation arrangement of 2.5% per year of net asset value in account for a market timing service by the broker-dealer is "special compensation"); *CFS Securities Corp.*, 1987 SEC No-Act. LEXIS 1663 (Feb. 27, 1987) (fee of $39 for customer to attend a seminar is "special compensation" because it is not transactional commission, and disqualifies broker-dealer from invoking the broker-dealer exclusion to the Advisers Act).

[40] Although the provision speaks only of the SEC's authority to file civil actions for breach of fiduciary duty, it implicitly codifies the duty, because the SEC could not enforce a duty that does not exist. *See Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975) ("the Act implicitly established a federal standard of fiduciary duty").

[41] As principal underwriter, OppenheimerFunds Distributor is expressly listed in Section 36(a) as subject to the fiduciary duty. OppenheimerFunds Distributor already has a fiduciary duty to its own shareholder (parent OppenheimerFunds, Inc.), but it must also, under the ICA, act in the best interests of the mutual fund and *its* shareholders, which gives rise to an obvious conflict of interest. The ICA deals with this conflict by requiring the unaffiliated board members – the only

The oversight role of the Trustees includes compliance with SEC Rule 38a-1, promulgated under the ICA,[42] which reinforces the Section 36(a) fiduciary duty by requiring the Trustees to adopt written compliance programs for the Trust, *and to review and approve the compliance programs of the service providers, including OppenheimerFunds Distributor.*  The compliance programs must be designed to prevent, detect and correct violations of the federal securities laws by service providers.  17 C.F.R. § 270.38a-1.  "Federal securities laws" is specifically defined to include the Advisers Act.  All of defendants' lengthy arguments about Rule 38a-1 ignore or misstate this basic structure.

Moreover, the promulgating release for Rule 38a-1 clarifies that "[s]erious compliance issues must, of course, always be brought [by the Chief Compliance Officer] to the board's attention promptly, and cannot be delayed until an annual report."  Rule 38a-1 Promulgating Release, 2003 SEC LEXIS 2980 at *51 n.84.  Therefore, there is a clear duty to act immediately if Trust assets are being used improperly.  Defendants have offered no basis to conclude otherwise.

It is clear that OppenheimerFunds Distributor has a defective compliance program, because -- according to the standards announced in its motion --  it is only checking that broker-dealers are in compliance with Exchange Act registration requirements, while failing to check whether broker-dealers receiving asset-based compensation are registered under the Advisers Act

---

non-conflicted advocates for the fund and its shareholders – to oversee OppenheimerFunds Distributor.  *See Burks v. Lasker*, 441 U.S. 471, 484 (1979) (ICA was "designed to place the unaffiliated directors in the role of 'independent watchdogs'. . . [with] the primary responsibility for looking after the interests of the funds' shareholders") (quoting *Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977)).

[42] SEC Rule 38a-1 was adopted following a series of scandals that rocked the mutual fund industry in 2003, in which service providers to some mutual funds were discovered to be entering into improper and illegal arrangements that were abusive to fund investors, due to inadequate or ineffective oversight by fund directors/trustees.  *See* Final Rule, Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980, at *6 (Dec. 17, 2003) ("Rule 38a-1 Promulgating Release") (stating that "unlawful conduct involving a number of fund advisers, broker-dealers, and other service providers. . . confirms the need for these rules. . . . [The service providers] placed . . . the business interests of the fund adviser ahead of the interests of fund shareholders, thus breaching their fiduciary obligations to the funds involved and their shareholders").

and are providing advisory accounts to hold the respective Trust shares.  *See* Complaint ¶ 53, 55. Compliance with the Advisers Act is of no less importance than compliance with the Exchange Act.[43]

In addition to their responsibility for OppenheimerFunds Distributor's compliance program, Rule 12b-1 requires the Trustees to review "at least quarterly, a written report of the amounts so expended and the purposes for which such expenditures were made," thus providing the board with numerous additional opportunities to ascertain that asset-based compensation was improperly being paid in connection with brokerage accounts. Complaint ¶¶ 50, 79.

In addition, the customers -- who are being deprived of the advisory accounts to which they are entitled by law -- are the same persons who are the shareholders of the Trust to whom the Trustees and OppenheimerFunds Distributor owe a fiduciary duty of care.

Accordingly, the Trustees and OppenheimerFunds Distributor have (i) a duty under the ICA to not make improper use of Trust assets, including making compensation payments to broker-dealers that are unlawful under the Advisers Act; (ii) a duty under the ICA to not approve the compliance procedures used by OppenheimerFunds Distributor when those procedures are defective because they provide for using Trust assets to make unlawful compensation payments; (iii) a duty to immediately correct any material violations of the federal securities laws, including payments that are unlawful under the Advisers Act; and (iv) a fiduciary duty to Trust shareholders who are unlawfully deprived of advisory accounts, either to enforce the duty of the broker-dealers to provide the advisory accounts, or to cease paying unlawful asset-based compensation with respect to shares held in brokerage accounts.

---

[43] Defendants dispute the agency relationship created by Rule 12b-1 when there is a payment of compensation for distribution-related activities, preferring to refer to the broker-dealers as "firms that assist in the distribution of Fund shares[.]"  *See* Motion at 14.  However, as a matter of law, the Trust can only act through its agents, and Rule 12b-1 states that it is the Trust that is the distributor (*i.e.,* "a company will be deemed to be acting as a distributor of securities of which it is the issuer").  Therefore, OppenheimerFunds Distributor is an agent of the Trust, and the retail broker-dealers are sub-agents.  Nevertheless, this dispute is not material to defendants' motion to dismiss, because the Trust and OppenheimerFunds Distributor have the same duty not to use Trust assets improperly irrespective of any agency relationship.

## IV.   DEFENDANTS' DUTIES UNDER THE ICA TRUMP THEIR CONTRACTUAL ARRANGEMENTS TO MAKE UNLAWFUL PAYMENTS

### A.   Section 47(b) Permits Actions For Rescission and Restitution

Section 47(b) of the ICA ("Validity of Contracts"), 15 U.S.C. § 80a-46(b), plainly states that "either party" may void a contract "whose performance involves" a violation of "any provision" of the ICA or any rule, regulation or order thereunder.  The statute refers to "a court" as the tribunal that voids an offending contract.  Accordingly, contractual obligations that conflict with a regulated party's duties under the ICA are voidable by a court.  Section 47(b) has nearly identical counterparts in the other securities laws.[44]

Defendants seek to change the plain language of these contract voiding statutes.  They contend that voiding a contract "whose performance involves" a violation of the ICA, or a rule, etc., thereunder, requires that the underlying violation *itself be prosecuted in a private right of action.  See* Motion at 18-23.

Defendants fail to mention that their argument was considered and rejected in a controlling Supreme Court decision that is directly on point, *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979).  The Supreme Court held that the contract voiding provision of the Advisers Act allows for an independent right of action for rescission and restitution, *irrespective of the fact that there are no private rights of action for damages under any provision of the Advisers Act or any rule, regulation or order thereunder.*

For purposes of the present analysis, there is no basis for distinguishing between contract voiding under the Advisers Act (*Transamerica*) and the ICA (this case).  The contract voiding provisions of the federal securities laws have always been construed *in pari materia*, and *Transamerica* has been consistently followed.  There are seven decades of authorities directly contrary to defendants' argument,[45] and a high profile SEC amicus brief, all on point.[46]

---

[44] *See* Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), and Section 215(b) of the Advisers Act, 15 U.S.C. § 80b-15.

[45] *See, e.g., GFL Advantage Fund, Ltd v. Colkitt*, 272 F.3d 189, 206 n.6 (3d Cir. 2001) (contract voiding provision only requires a violation of the predicate statute, not maintenance of private suit thereunder, therefore a plaintiff seeking to void a contract in violation of the anti-fraud

Defendants' argument is also baseless because it would require finding that Congress intended, when Section 47(b) was enacted in 1940, to promulgate a statutory nullity -- while Congress provided for contract voiding, it immediately neutered the provision, because the ICA in 1940 did not include any private rights of action for damages.  Defendants' argument is that when Congress wrote that a contract in violation of "*any provision*" was voidable, Congress really meant no such violation could ever arise, because no provision of the ICA included a private right of action.

There are additional reasons to conclude that Congress intended the plain language of Section 47(b) to mean what it says.  In the counterpart section of the Exchange Act (Section

---

statute in the Exchange Act is not required to prove reliance and damages, which are solely elements of a private right of action for damages and not elements of the anti-fraud statute); *Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 208 (3d Cir. 2006) (same); *Rhoades v. Powell*, 644 F. Supp. 645, 661-64 (E.D. Cal. 1986) (extensive analysis demonstrating that Section 29(b) claim can be based on a violation of an Exchange Act provision that does not contain a private right of action); *Roberts v. Smith Barney Harris Upham & Co.*, 653 F. Supp. 406, 414 (D. Mass. 1986) ("section 29(b) creates substantive rights to void a contract that are independent of the rights created by section 15(c)(1)"); *Couldock & Bohan, Inc. v. Societe Generale Securities Corp.*, 93 F. Supp. 2d 220, 231 (D. Conn. 2000) (performance of a clearing agreement involved numerous violations of Exchange Act provisions and is therefore void pursuant to Section 29(b)); *Margaret Hall Foundation, Inc. v. Atl. Fin. Mgmt., Inc.*, 572 F. Supp. 1475, 1485 (D. Mass. 1983) (fact that predicate statute has no private right of action for damages is completely irrelevant to contract voiding action for rescission and restitution); *see also Franklin Nat'l Bank v. L.B. Meadows & Co.*, 318 F. Supp. 1339, 1341 (E.D.N.Y. 1970) (listing Section 47(b) among "[o]nly few sections of the various Securities Acts [that] provide explicitly for private actions"); *Freeman v. Marine Midland Bank-New York*, No. 71-42, 1979 U.S. Dist. LEXIS 12177, at *5-6 (E.D.N.Y. May 24, 1979) ("[T]he Court is not being asked to imply a private right of action for damages. . . [C]ourts have held that section 29(b) provides a plaintiff with an independent and express statutory right to relief." (citations omitted)); *Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245, 249 (S.D. Ga. 2005) (certifying a nationwide class of variable annuity contract owners on standalone claim for contract voiding under Exchange Act); *Kardon v. Nat'l Gypsum Co.*, 69 F. Supp. 512, 514 (E.D. Pa. 1946) ("a statutory enactment that a contract of a certain kind shall be void almost necessarily implies a remedy in respect of it.  The statute would be of little value unless a party to the contract could apply to the Courts to relieve himself of obligations under it or to escape its consequences."); *Brown v. Bullock*, 194 F. Supp. 207, 232 (S.D.N.Y. 1961) (a right of action "must be granted; otherwise section 47(b) would be an idle legislative gesture"), *aff'd*, 294 F.2d 415 (2d Cir. 1961) (en banc).

[46] *See* Brief of the SEC, Amicus Curiae, Submitted at the Court's Request (Dec. 5, 2001) at Section II, filed in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), *available at* www.sec.gov/litigation/briefs/olmsted.htm ("SEC Amicus Brief") (extensive analysis that Section 47(b) of the ICA provides a distinct cause of action irrespective of whether the predicate statute in the ICA alleged to be violated contains any express or implied private right of action for damages).

29(b)), the contract voiding provision also uses the language "*any provision,*" but then goes on to specifically exclude a certain predicate provision.  The Exchange Act contract voiding section also provides, for another predicate provision, a special statute of limitations.  *See* 15 U.S.C. § 78cc(b).  Those predicate provisions (subsections of Section 15 of the Exchange Act) *do not have a private right of action* to enforce them.

Moreover, in introducing the special statute of limitations in Section 29(b) covering actions under the contract voiding statute predicated on certain provisions of the Exchange Act, Congress used the language: "no contract shall be deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection [filed after the statute of limitations period]."  *See* 15 U.S.C. § 78cc(b).  That language -- "any action maintained in reliance upon this subsection" -- refers to an action under the contract voiding provision, to void a contract that violates a section of the Exchange Act that has no private right of action for damages.

Therefore, Congress stated *in its own plain words* that persons have a right of action under the Exchange Act's contract voiding provision to void a contract that violates a statutory or regulatory provision under the Act, *even if the provision itself has no private right of action.*  The contract voiding statutes are plainly intended by Congress to apply to violations of "*any provision*" irrespective of whether that provision (statute or regulation) has a private right of action.

The purpose of the contract voiding provisions is to ensure that private contractual obligations do not trump the statutory and regulatory obligations of regulated parties.  The contract voiding statutes promote compliance with the law.  The provision is limited to rescission and restitution, and does not allow for recovery of damages.  This is yet another reason why the gloss that defendants seek to add to the statute is contrary to the entire statutory scheme.

The cases defendants cite in support of their position that Section 47(b) was intended by Congress to be a total statutory nullity are not persuasive, because none cites or distinguishes the controlling Supreme Court opinion in *Transamerica Mortgage Advisors*, or any of the other precedents on point.  The *Franklin/Templeton Distributors* case that defendants primarily rely on

contains no analysis that is germane to the issue, and the remaining cases cited by defendants are all essentially in the same series of lawsuits,[47] filed by the same plaintiffs' law firm, in which the plaintiffs (i) had no standing to bring a Section 47(b) claim *and* (ii) had told the court that they did not want to pursue their Section 47(b) claim if the other claims in the case were dismissed. *See Dull v. Arch*, 2005 U.S. Dist. LEXIS 14988 at *8 (N.D. Ill. July 27, 2005); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 558 (E.D. Pa. 2005); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 (C.D. Cal. 2005); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 378 (D. Mass. 2005); *Davis v. Bailey*, 2005 U.S. Dist. LEXIS 38204, at *18-19 (D. Colo. Dec. 22, 2005).

That is significant because the plaintiffs in those cases were making a frivolous argument -- that even though they were not parties to the contract they sought to void, and they were not suing derivatively, they nevertheless had standing to void the mutual fund's contracts because Section 47(b) was a "remedy rather than a distinct cause of action[.]"  *See Hamilton*, 396 F. Supp. 2d at 558.  The courts in those cases simply repeated what the plaintiffs stated, which essentially amounted to voluntary dismissals.  None of the decisions purports to address or distinguish the controlling authority.

Since the vague *dicta* cited by defendants does not purport to state the law, ignores binding Supreme Court precedent,[48] and is not persuasive, this Court should not follow it.[49] Plaintiff has adequately alleged a claim under Section 47(b) for contract voiding.

---

[47] The suits each contended that a defendant mutual fund company had failed to participate in class action settlements involving underlying securities held in the mutual funds.  *See Everett v. Bozic*, No. 05-296, 2006 U.S. Dist. LEXIS 55824, at *3 (S.D.N.Y. Aug. 2, 2006) (another of "more than 40 virtually identical actions filed by Plaintiffs' counsel against major U.S. mutual fund companies").  The plaintiffs sought to void mutual fund management contracts for failure of the manager to pursue the class action settlement funds.  In *Everett*, the court dismissed the Section 47(b) count for failure to plead as a derivative action.

[48] *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts.").

[49] By failing to cite controlling Supreme Court authority contrary to their legal position, to distinguish it on the facts, to argue that it is no longer good law, or to use some other permissible form of advocacy, defendants are testing the limits of proper advocacy.  *See Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*, No. 97-359, 1999 U.S. Dist. LEXIS 15383, at *55 (S.D. Cal. Aug. 12, 1999).

Next, defendants argue that the payments at issue are "collateral or tangential" transactions, not connected to the distribution agreement between Trust and OppenheimerFunds Distributor, because plaintiff has conceded that Rule 12b-1 does not itself prohibit the payments. *See* Motion at 25-27.  However, the payments are certainly not collateral to the distribution agreement.  If the Trust were to unilaterally stop making the payments, the broker-dealers could sue OppenheimerFunds Distributor, and OppenheimerFunds Distributor in turn could sue the Trust for breach of the distribution agreement, because that is the contractual source of the Trust's duty to make the payments.  The payments are not tangential to the distribution agreement providing for the payments.

It is well established that contractual obligations to make payments to broker-dealers that are not properly registered are subject to being voided under the contract voiding statutes.  For instance, in *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982), a compensation agreement with a broker-dealer was lawful on its face, but the broker-dealer was not registered, and therefore the agreement could not be performed without violating the securities laws.  *Id*.  The court held that the contract was voidable under the contract voiding provision of the Exchange Act, and rejected the argument that the statute should be limited to only contracts that are unlawful on their face: "A statute that voided only contracts by which persons have agreed in express terms to violate the Act would be so narrow as to be a waste of the congressional time spent in its enactment."  *Id*.  Accordingly, because here the distribution agreement is the source of the contractual obligation to make the offending payments, the contract is voidable.[50]

---

[50] In a footnote, Motion at 25 n.38, defendants argue that the Trust's request for contract voiding is "barred by ICA Section 38(c)," which provides: "No provision of this title imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule, regulation, or order of the Commission, notwithstanding that such rule, regulation, or order may, *after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason*." (emphasis added).  Defendants misquote the statute by omitting the highlighted portion, and argue that they complied with Rule 12b-1 so they can face no liability.  This is baseless because (i) Rule 12b-1 has not been vacated; and (ii) defendants can easily comply with Rule 12b-1 *and* all other applicable laws, including the Exchange Act and the Advisers Act.  Moreover, plaintiff does *not* seek restitution for the Trust for payments made in

### B.      The Trust's Right to Restitution Is Adequately Alleged

Finally, defendants argue that restitution back to the Trust of the payments at issue would be unjust.  Motion at 31-32   Section 47(b) provides for restitution as an inherent component of rescission,[51] but, according to defendants, plaintiff "does not allege that [OppenheimerFunds Distributor] ever failed to provide the services for which the [Trust] has compensated [OppenheimerFunds Distributor] pursuant to the Rule 12b-1 Plan," and therefore restitution would be unjust.

To the contrary, the Complaint alleges that Trust shareholders are entitled to advisory accounts, "*i.e.*, an account that provides the client with the investor protections and benefits of the Advisers Act."  Complaint ¶ 4.  Indeed, the express purpose of the Advisers Act is to ensure that investors who are paying ongoing relationship compensation receive the benefits of an ongoing relationship, including the fiduciary duties owed by an advisor who acts solely in the investors' best interest and who provides non-conflicted advice and full disclosure of third-party compensation arrangements.[52]  OppenheimerFunds Distributor arranged for broker-dealer

---

good faith conformity with SEC Rule 202(a)(11)-1 -- which was invalidated by *Financial Planning Association* effective October 1, 2007 -- pursuant to Section 38(c) of the ICA and its counterpart, Section 211(d) of the Advisers Act.  Complaint ¶¶ 55, 72, 78.  Therefore, defendants do not face any liability for their compliance with the regulation that actually was invalidated.

[51] *See Transamerica Mortgage Advisors, Inc.*, 444 U.S. at 19 (contract voiding provision includes "the customary legal incidents of voidness" including restitution); *Goldstein v. Groesbeck*, 142 F.2d 422, 426 (2d Cir. 1944) (the contract voiding provision "in express terms declares the contracts void.  It should follow that the [plaintiffs] are entitled to a refund, for no other result can fulfill the expressed purpose of the Act"); *In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 873, 880 (D. Md. 2005) ("Section 47(b) contemplates civil suits for relief by way of rescission and for damages.") (quoting *Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir. 1977)).

[52] An SEC-sponsored report, published on January 8, 2008, authored by the RAND Corporation, titled "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers" (available at www.sec.gov/news/press/2008/2008-1.htm) ("RAND Report"), contains an extensive comparison of the legal duties owed by broker-dealers versus investment advisers. The RAND Report observes that "unlike broker-dealers, federally registered investment advisers owe fiduciary obligations to their clients as a *categorical* matter. . . such obligations require the adviser to act solely with the client's investment goals and interests in mind, free from any direct or indirect conflicts of interest that would tempt the adviser to make recommendations that would also benefit him or her. . . ."  RAND Report at 13 (emphasis in original).  The RAND Report notes that its discussion of the differences in regulation between broker-dealers and

services, but failed to arrange for the Advisers Act services and protections that the law required the broker-dealers to provide to Trust shareholders.

Instead, what Trust shareholders got was conflicted advice from broker-dealers who were subject only to limited transactional "salesman" duties, and who were free to maximize their compensation without making the disclosures required by the Advisers Act and its regulations.

Accordingly, plaintiff has adequately alleged unjust enrichment supporting restitution. Plaintiff, on behalf of the Trust, is entitled to present expert testimony and other evidence at trial establishing that the violations of law at issue here were not harmless and that restitution is equitable.[53] *See Van Zanen v. Qwest Wireless, LLC*, 522 F.3d 1127, 1132 (10th Cir. 2008) (where claim is based on allegation that performance is flawed, and not solely on the harmless lack of a license, restitution is proper); *EnergyTec, Inc. v. Proctor*, 516 F. Supp. 2d 660, 675 (N.D. Tex. 2007) (payments to unlicensed broker-dealers may be recovered in restitution under contract voiding statute where plaintiff can prove that broker-dealers were unjustly enriched).[54]

---

investment advisers "is by no means a complete exegesis of the copious regulatory distinctions within these fields, which would require volumes."  RAND Report at 7 n. 1.

[53] Moreover, the plain language of Section 47(b) states that "**to the extent [the] contract. . .  has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this title**." 15 U.S.C. § 80a-46(b)(2). The Court should not make such findings in the absence of a factual record.

[54] Defendants also argue that the applicable one year from discovery/three year repose statute of limitations "restricts Plaintiff's restitution claim only to conduct that occurred since March 19, 2009."  Motion at 32 n. 40 (calculating one year prior to the date of plaintiff's complaint). However, in a derivative action, the discovery statute of limitations is tolled for as long as the allegedly culpable trustees/directors are in control of the trust/corporation, pursuant to the doctrine of adverse domination.  *See FDIC v. Appling*, 992 F.2d 1109, 1115 (10th Cir. 1993), *citing Farmers & Merchants Nat'l Bank. v. Bryan*, 902 F.2d 1520 (10th Cir. 1990).  Although defendants are entitled to show that "[they] took actions which were contrary to their own interests" and sought to prevent or stop the wrongdoing at issue, and thus preclude the application of the adverse domination doctrine, that is always an issue for the jury. *See id.* at 1116.  Moreover, defendants' argument that the shareholders had a duty to discover the claims and file a derivative action earlier than this action because the Rule 12b-1 fees are disclosed in the prospectus, is without merit.  The prospectus raises no "red flags" creating a duty to investigate, shareholders are not legal experts in the regulation of the financial services industry, and, moreover, shareholders are entitled to rely on the expertise of the defendants, all of whom had a statutory fiduciary duty of loyalty to shareholders.  Accordingly, the restitution period in this case is three years prior to the date of filing of the Complaint.

**V.    THE COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION
       OVER THE STATE LAW CLAIMS**

Defendants request that the Court decline to exercise supplemental jurisdiction over the Trust's state law claims[55] if the Court dismisses the federal claim.  Given that plaintiff, on behalf of the Trust, has adequately alleged a claim under Section 47(b) of the ICA, the Court should also exercise supplemental jurisdiction over the state law claims.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the motion to dismiss in its entirety.

MILBERG LLP

DATED:        August 4, 2010


_____/s/ Janine L. Pollack_____
              Janine L. Pollack
Michael C. Spencer
**mspencer@milberg.com**
Janine L. Pollack
**jpollack@milberg.com**
One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300
Facsimile:   (212) 868-1229

Jeffrey A. Chase
**jchase@jacobschase.com**
Andrew W. Myers
**amyers@jacobschase.com**
JACOBS CHASE FRICK KLEINKOPF
& KELLEY LLC
1050 Seventeenth Street, Suite 1500
Denver, CO  80265
Telephone:  (303) 685-4800
Facsimile:    (303) 685-4869

Lee A. Weiss
**lweiss@bwgfirm.com**
BROWNE WOODS GEORGE LLP
1 Liberty Plaza, Suite 2329

---

[55] The Complaint alleges federal question jurisdiction for all the claims in this case and, alternatively, supplemental jurisdiction for the state law claims.  *See* Complaint ¶ 7; *Nicodemus v. Union Pacific Corp.*, 440 F.3d 1227, 1232 (10th Cir. 2006) (a state law claim arises under federal law if "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law").

New York, NY  10006
Telephone:  (212) 354-4901
Facsimile:   (212) 354-4904


Ronald A. Uitz
**ron877@yahoo.com**
UITZ & ASSOCIATES
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:   (202) 521-0619

Alfred G. Yates, Jr. Esq.
**yateslaw@aol.com**
LAW OFFICE OF ALFRED G. YATES, JR.
P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 391-5164
Facsimile:   (412) 471-1033

**Attorneys for Plaintiff**

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2010 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

David A. Kotler
david.kotler@dechert.com

William K. Dodds
William.dodds@dechert.com, luis.lopez@dechert.com

Robert N. Miller
rmiller@perkinscoie.com, rmiller-efile@perkinscoie.com

Stephanie E. Dunn
sdunn@perkinscoie.com; sdunn-efile@perkinscoie.com

Arthur H. Aufses, III
aaufses@kramerlevin.com

Edward T. Lyons, Jr.
elyons@joneskeller.com



    /s/   Janine L. Pollack       
            Janine L. Pollack